Patrick R. Leverty, NV Bar No. 8840
William R. Ginn, NV Bar No. 6989
LEVERTY & ASSOCIATES LAW CHTD.
Reno Gould House
832 Willow Street
Reno, NV 89502
Tel. 775.322.6636
Fax. 775.322.3953
Email: pat@levertylaw.com

*Attorneys for Plaintiff*

[Additional counsel on signature block]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| ANDREW HULM, derivatively on behalf of BIOVIE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CUONG DO, JOSEPH PALUMBO, RICHARD J. BERMAN, STEVE GORLIN, ROBERT HARIRI, JIM LANG, SIGMUND ROGICH, and MICHAEL SHERMAN,<br><br>Defendants,<br><br>and<br><br>BIOVIE INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Andrew Hulm ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant BioVie Inc. ("BioVie" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Cuong Do ("Do"), Joseph Palumbo ("Palumbo"), Richard J. Berman ("Berman"), Steven Gorlin ("Gorlin"), Robert Hariri ("Hariri"), Jim

Lang ("Lang"), Sigmund Rogich ("Rogich"), and Michael Sherman ("Sherman") (collectively, the "Individual Defendants" and together with BioVie the "Defendants") for breaches of their fiduciary duties as directors and/or officers of BioVie, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BioVie, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by BioVie's directors and officers from December 7, 2022 to November 28, 2023, both dates inclusive (the "Relevant Period").

2. BioVie represents itself to be "a clinical-stage company developing innovative drug therapies for the treatment of neurological and neurodegenerative disorders and advanced liver disease."[1]

3. On August 5, 2021, the Company started a "pivotal" Phase 3 clinical trial for NE3107 which was called "NM101." For purposes of FDA clinical trial procedure, "pivotal" means that it is the particular study that the drug company will primarily rely upon in its NDA in order to receive approval from the FDA to market the drug. The NM101 clinical trial was randomized

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1580149/000152013824000324/bivi-20240630_10k.htm

and double-blind, and its purpose was to analyze NE3107 in patients who had mild to moderate Alzheimer's disease. BioVie originally informed investors that the NM101 trial would reach completion by late 2022, but later extended the target completion date to mid-2023.

4. Issues continued to arise in the NM101 study when, in December 2022, members of the clinical trial staff detected evidence of patient data fraud. As a result, the NM101 study was subjected to a "for-cause" audit conducted by a third-party consultant. This audit turned up evidence of falsified medical history records and led to a recommendation that the Company cease enrollment in the trial and close the site. This report was then run up the corporate ladder, by regulation, to the Defendants Do and Palumbo. However, instead of heeding the auditor's recommendation and ending the trial, the Company was forced to continue enrolling and testing patients who were ineligible for the NM101 study while publicly highlighting the progress of the trial to investors.

5. As could be expected, by continuing the NM101 study, the protocol violations and fraudulent patient data continued. In August 2023, a second "for-cause" audit (together with the audit in December 2022, the "Audits") was conducted. The results of this audit were almost identical to that of the December 2022 audit. These findings included, among other things, MRI reports were not obtained in accordance with trial protocol or industry standards, multiple patients who presented with verbatim diagnoses received from the same treatment facility on the same day, and medical records that were unsigned and contained contradictory information. The auditor concluded that these findings were strong evidence of fraud that required further investigation to determine the cause of the missing data and the inability to confirm the data found in the patient files. As was regulation, these findings were run up the corporate latter and subsequently disregarded by Defendants Do and Palumbo.

6. The truth began to emerge during after-market hours on November 8, 2023 when the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2023.

The quarterly report revealed that "during routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites." The report also admitted that "***these findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study (NCT04669028) and may require additional clinical studies to confirm the final results of the study***."[2]

7. On this news, the price per share of the Company's common stock fell to a low of $2.31 per share on November 9, 2023, from a closing price of $4.26 on November 8, 2023.

8. The truth fully emerged on November 29, 2023 when the Company filed a current report on Form 8-K with the SEC which represented that BioVie "issued a press release and posted on its website at https://BioViepharma.com/ an investor presentation disclosing top line data from its clinical trial of NE3107 in the treatment of mild to moderate Alzheimer's Disease." The Form 8-K attached a copy of the press release, which stated that "***Upon [NM101] trial completion, the Company found significant deviation from protocol and Good Clinical Practice (GCP) violations at 15 sites (virtually all of which were from one geographic area). This highly unusual level of suspected improprieties led the Company to exclude all patients from these sites and to refer them to the U.S. Food and Drug Administration (FDA) Office of Scientific Investigations (OSI) for further action.***"

9. On this news, the price per share of the Company's stock fell $3.03, from a closing price of $4.99 per share on November 28, 2023 to close at $1.96 per share on November 29, 2023.

10. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to BioVie, willfully or recklessly made and/or caused the Company to make false and

---

[2] All emphasis has been added unless otherwise noted herein.

misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, the data integrity issues associated with the NM101 trial. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. Moreover, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping combined total proceeds of approximately $224,805.

13. In light of the Individual Defendants' misconduct, which has subjected BioVie, its President/Chief Executive Officer ("CEO"), and its Chief Medical Officer ("CMO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action") and which has further subjected the Company to the need

to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of BioVie. Plaintiff has continuously owned BioVie common stock since first purchasing the stock on December 12, 2021.

22. Plaintiff is a citizen of South Dakota.

### Nominal Defendant BioVie

23. BioVie is a Nevada corporation with its principal executive offices at 680 W Nye Lane, Suite 201, Carson City, NV 89703. BioVie's shares trade on The NASDAQ Stock Market, LLC ("NASDAQ") under the ticker symbol "BIVI."

### Defendant Do

24. Defendant Do has served as the Company's CEO and President since April 27, 2021 and as a Company director since 2016.

25. For the fiscal year ended June 30, 2024 (the "2024 Fiscal Year"), Defendant Do received $777,082 in total compensation from the Company. This included $618,000 in salary, $79,632 in stock awards, and $79,450 in option awards. For the fiscal year ended June 30, 2023 (the "2023 Fiscal Year"), Defendant Do received $2,337,668 in total compensation from the Company. This included $618,000 in salary, $463,500 in bonus, $734,668 in stock awards, and $521,500 in option awards.

26. Upon information and belief, Defendant Do is a citizen of Nevada.

### Defendant Palumbo

27. Defendant Palumbo has served as the Company's CMO since November 2021.

28. For the 2024 Fiscal Year, Defendant Palumbo received $669,584 in total compensation from the Company. This included $560,000 in salary, $54,984 in stock awards, and $54,600 in option awards. For the 2023 Fiscal Year, Defendant Palumbo received $1,090,499 in total compensation from the Company. This included $525,000 in salary, $197,000 in bonus, $242,499 in stock awards, and $126,000 in option awards.

29. Upon information and belief, Defendant Palumbo is a citizen of Pennsylvania.

**Defendant Berman**

30. Defendant Berman has served as a Company director since June 2019. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

31. For the 2024 Fiscal Year, Defendant Berman received $156,008 in total compensation from the Company, which consisted entirely of stock awards. For the 2023 Fiscal Year, Defendant Berman received $266,697 in total compensation from the Company, which consisted entirely of stock awards.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Berman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2023-08-22 | 10,805 | $3.50 | $37,828 |
| 2023-06-07 | 5,984 | $5.81 | $34,784 |
| 2023-05-22 | 5,000 | $6.50 | $32,505 |
| 2023-03-28 | 7,613 | $8.52 | $64,870 |
| 2023-03-27 | 3,371 | $8.52 | $28,710 |

Thus, in total, before the fraud was exposed, he sold 32,773 shares of Company common stock on inside information, for which he received approximately $198,697 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33. Upon information and belief, Defendant Berman is a citizen of Nevada.

**Defendant Gorlin**

34. Defendant Gorlin served as a Company director from June 2020 until he resigned on July 25, 2024.

35. For the 2023 Fiscal Year, Defendant Gorlin received $209,549 in total compensation from the Company, which consisted entirely of stock awards.

36. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gorlin made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2023-09-05 | 8,560 | $3.05 | $26,108 |

Thus, in total, before the fraud was exposed, he sold 8,560 shares of Company common stock on inside information, for which he received approximately $26,108 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37. Upon information and belief, Defendant Gorlin is a citizen of Nevada.

**Defendant Hariri**

38. Defendant Hariri has served as a Company director since June 2020. He also serves as a member of the Nominating and Corporate Governance Committee (the "Governance Committee").

39. For the 2024 Fiscal Year, Defendant Hariri received $127,185 in total compensation from the Company, which consisted entirely of stock awards. For the 2023 Fiscal Year, Defendant Hariri received $209,549 in total compensation from the Company, which consisted entirely of stock awards.

40. Upon information and belief, Defendant Hariri is a citizen of New Jersey.

**Defendant Lang**

41. Defendant Lang has served as Chairman of the Board since March 2023 and as a Company director since 2016. He also serves as Chair of the Governance Committee and as a member of the Audit Committee.

42. For the 2024 Fiscal Year, Defendant Lang received $171,105 in total compensation from the Company, which consisted entirely of option awards. For the 2023 Fiscal Year, Defendant Lang received $266,697 in total compensation from the Company, which consisted entirely of stock awards.

43. Upon information and belief, Defendant Lang is a citizen of Massachusetts.

**Defendant Rogich**

44. Defendant Rogich has served as a Company director since June 2020. He also serves as a member of the Audit Committee.

45. For the 2024 Fiscal Year, Defendant Rogich received $127,185 in total compensation from the Company, which consisted entirely of stock awards. For the 2023 Fiscal Year, Defendant Rogich received $223,300 in total compensation from the Company, which consisted entirely of option awards.

46. Upon information and belief, Defendant Rogich is a citizen of Nevada.

**Defendant Sherman**

47. Defendant Sherman has served as a Company director since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Governance Committee.

48. For the 2024 Fiscal Year, Defendant Sherman received $164,243 in total compensation from the Company, which consisted entirely of option awards. For the 2023 Fiscal Year, Defendant

Sherman received $304,500 in total compensation from the Company, which consisted entirely of option awards.

49. Upon information and belief, Defendant Sherman is a citizen of New York.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50. By reason of their positions as officers, directors, and/or fiduciaries of BioVie and because of their ability to control the business and corporate affairs of BioVie, the Individual Defendants owed BioVie and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BioVie in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BioVie and its shareholders so as to benefit all shareholders equally.

51. Each director and officer of the Company owes to BioVie and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52. The Individual Defendants, because of their positions of control and authority as directors and/or officers of BioVie, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53. To discharge their duties, the officers and directors of BioVie were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54. Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of BioVie, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised BioVie's Board at all relevant times.

55. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56. To discharge their duties, the officers and directors of BioVie were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of BioVie were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to BioVie's own Code of Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how BioVie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of BioVie and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BioVie's operations would comply with all applicable laws and BioVie's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57. Each of the Individual Defendants further owed to BioVie and the shareholders the duty of loyalty requiring that each favor BioVie's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58. At all times relevant hereto, the Individual Defendants were the agents of each other and of BioVie and were at all times acting within the course and scope of such agency.

59. Because of their advisory, executive, managerial, and directorial positions with BioVie, each of the Individual Defendants had access to adverse, non-public information about the Company.

60. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BioVie.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan,

conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of BioVie was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BioVie and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

***Regulatory Background with Respect to Clinical Trials***

66. In order to obtain permission from the FDA to market a drug to the public, a company (or sponsor) first must be able to show that the drug is safe and effective and further that its benefits outweigh its risks. Typically, this is accomplished by companies conducting clinical trials and submitting a New Drug Application ("NDA") with the FDA. According to the American Cancer Society, Phase 1 trials of a new drug are "usually the first that involve people" and are "done to find the highest dose of [a] new treatment that can be given safely without

causing severe side effects."[3] On the other hand, Phase 2 trials: (a) typically involve bigger populations of patients; (b) analyze dosage tolerance and proper dosage; (c) determine possible short-term adverse effects and safety risks; and (d) provide a preliminary evaluation of the efficacy of the drug for specific indications. Phase 3 trials are typically reserved for a "[t]reatment[] that [has] been shown to work" in a Phase 2 trial, and they "compare the safety and effectiveness of the new treatment against the current standard treatment" for a disease.[4] Moreover, Phase 3 trials include several hundred patients and are performed in various places around the nation at the same time. Phase 3 trials are intended to establish the overall risk-benefit profile of the drug.

67. NDAs are required to include all relevant information with respect to the drug, including data sufficient to determine whether: (1) the drug is safe and offers the benefits it purports to; (2) the drug's benefits outweigh its risks; (3) the proposed labeling for the drug is appropriate and contains all information that it should; and (4) the processes used in manufacturing the drug's identity, strength, quality, and purity.

***NE3107 and the Company's Phase 3 Clinical Trial for NM101***

68. In June 2021, the Company acquired the biopharmaceutical assets of NeurMedix, Inc., which included the Company's lead drug candidate called "NE3107." The Company represented to investors that NE3107 showed promise that it could be "an entirely new medical approach" for the treatment of Alzheimer's disease and Parkinson's disease, which "affect[] an estimated 6 million Americans suffering from Alzheimer's and 1 million from Parkinson's."

---

[3] https://www.cancer.org/cancer/managing-cancer/making-treatment-decisions/clinical-trials/what-you-need-to-know/phases-of-clinical-trials.html#:~:text=a%20new%20drug.-,Phase%20I%20clinical%20trials%3A%20Is%20the%20treatment%20safe%3F,without%20causing%20severe%20side%20effects.

[4] *Id.*

69. On August 5, 2021, the Company started a "pivotal" Phase 3 clinical trial for NE3107 which was called "NM101." For purposes of FDA clinical trial procedure, "pivotal" means that it is the particular study that the drug company will primarily rely upon in its NDA in order to receive approval from the FDA to market the drug. The NM101 clinical trial was randomized and double-blind, and its purpose was to analyze NE3107 in patients who had mild to moderate Alzheimer's disease. BioVie originally informed investors that the NM101 trial would reach completion by late 2022, but later extended the target completion date to mid-2023.

70. Investors and analysts paid particularly close attention to the NM101 study, with Oppenheimer on March 14, 2022 initiating coverage at "outperform" with a price target of $9/share based on NE3107. Indeed, the analyst reported: "Our bullish view is based on lead candidate NE3107 with an anti-inflammatory and insulin-sensitizing approach to neurodegeneration. NE3107 is an oral inhibitor of inflammatory ERK signaling that it could reduce neuroinflammation in Alzheimer's disease (AD) and Parkinson's disease (PD). We believe that emerging literature and prior preclinical and clinical data support this novel MOA [mechanism of action]. Ph3 trial of NE3107 in AD is ongoing with data expected ~YE21 [sic], and Ph2a trial of NE3107 in PD data are expected in 2Q22. We forecast peak sales for NE3107 of ~$1.3B for AD and ~$0.4B for PD in 2031, and apply our respective 50% and 20% POS estimates. Our $9 PT is driven by DCF valuation."

***The Company Receives a "For Cause" Audit for Study Protocol Violations While it Continues to Sell Shares to Retail Investors***

71. Around September 2022, the Company had enrolled approximately 150 patients in the NM101 study and was preparing for a data review by the study's data safety monitoring board of DSMB. DSMBs oversee drug companies conducting drug trials and consist of independent groups of experts. The DSMB's review of NM101 was set for late-2022.

72. However, upon preparing for the review, the Company was forced to undergo a "for cause" audit at one of the main study sites for NM101, Site No. 145 located in Cutler Bay, Florida, which audit would be performed by Pitts Quality Consulting on December 28 and December 29, 2022. A "for-cause" inspection in the context of a clinical trial is an inspection into a particular issue that has come to the attention of either the FDA or of the study's investigator or sponsor. It is critical to note that for-cause inspections are not common and are frequently triggered by complaints, concerns from the sponsor, and other reasons. The purpose of the Cutler Bay site's audit was to investigate the site's compliance with NM101's study protocol, Good Clinical Practices ("GCPs"), standard operating procedures, applicable regulations, and the adequacy of study monitoring occurring at the site.

73. Site No. 145 was under an enrollment hold at the time of the audit; this meant that the principal investigator of NM101 and/or the Company had halted enrollment due to potential misconduct). Upon completion of the audit, the auditor determined that the Cutler Bay site's compliance level was unacceptable due to, among other things, evidence of possible misconduct and inadequate site monitoring. The auditor's observations of noncompliance were critical, major, and minor, with the most critical observations concerned protocol compliance, including the fact that patient eligibility for the NM101 study could not be confirmed as a result of lack of data integrity of patient medical history records. The auditor also observed that patient testing was not being administered in a uniform manner for all patients due to different individuals rating patient responses using different languages.

74. During the audit, the auditor also discovered integrity issues and irregularities for numerous patient medical histories, particularly issues with patient medical records being falsified as a way to make patients appear "eligible" for the NM101 study when they would not have been based on their true medical records. Among other reported issues, the auditor found

that text had been inserted into the electronic medical records and patient treatment dates appeared to be fabricated.

75. In conclusion, the auditor determined that the NM101 study's eligibility could not be confirmed as a result of the lack of integrity in the medical records. It also determined that Cognitive Research Corporation, the clinical research organization responsible for monitoring site compliance, had conducted inadequate monitoring of the test site, particularly due to the fact that the rampant issues discussed above were never reported. Due to the foregoing, the auditor made recommendations that the Company continue the hold on enrollment and close the Cutler Bay site.

76. Following a closing meeting with the auditor on December 29, 2022, the Company received the auditor's report for review and acceptance and was thereafter required to give written responses concerning corrective actions.

77. Simultaneously to this, the Company continued to act like nothing was wrong, selling millions of dollars in shares to public investors through at-the-market offerings.

78. For example, on August 31, 2022, the Company entered into a sales agreement with Cantor Fitzgerald and B. Riley Securities. Through this agreement, the Company was able to sell shares into the open market. Pursuant to this agreement, the Company sold approximately 1.4 million shares between December 14 and December 21, 2022. These sales generated $15 million in cash for the Company, which accounted for approximately one-third of the Company's liquidity at the time.

79. Further, between December 21, 2022 and April 3, 2023, the Company sold an additional 3.6 million shares to public investors. These sales generated an additional $19.8 million in cash for the Company, which accounted for approximately two-thirds of the Company's liquidity at the time.

80. At no point during this period did the Company disclose its protocol violations and data falsification to public investors. In fact, as a result of these offerings, the Company's cash position was enough such that the Company was considered "financially well-positioned," which was a key factor in analysts raising their ratings for the Company in early 2023.

***Issues with the NM101 Trial Continue***

81. Despite knowing of the rampant problems with the NM101 trial, the Defendants failed to remediate them, and the issues continued into and throughout 2023.

82. On August 8 and 9, 2023, GeoSera performed a "for-cause" audit on the Cutler Bay Site No. 145, the second for-cause audit that had been performed at the site. GeoSera determined that source documentation for study participants was improper; notably, they determined that MRI reports had been altered to the extent where potential misconduct required further investigation to determine the validity of the MRIs submitted for the NM101 study.

83. Enrollment at the site was already complete at the time of the August audit. The site administrator, Jose Marichal, and the clinical research organization monitor, Jonathan Dominguez, were both present for the initial and closing meetings of the audit, as well as participated in the audit.

84. This audit turned up three vital findings, four significant findings, and one minor finding. Regarding the vital findings, the audit reported on MRI reports that appeared to have been modified in the demographics section and signature section of the reports, multiple MRI results which contained identical assessments for multiple patients, and discrepancies within the medical records regarding certain demographic information such as birth date and procedure date and times. Regarding the significant findings, the audit reported on record-keeping procedures that violated standard practices, such as overwriting reports as opposed to adding supplemental reports, reports that were unsigned, adding inconsistent notes in files, and

contemporaneous documentation from MRIs and other evaluations that was missing. Lastly, the minor finding was made regarding missing information in patient files that identified where patients received the MRIs. As a result, these findings caused GeoSera to give the Company an "unsatisfactory" rating as the observations were crucial and amounted to evidence of fraud.

85. In regards to the vital findings of the audit that were centered on data validity, GeoSera reported findings that related to files and medical records for over 30 patients (with a note that more would have been examined if not for time constraints). GeoSera reported that these 30 patient files were highly suspicious and indicative of fraudulent activity due to the files, *inter alia*:

a) containing exact, verbatim MRI findings, diagnoses, and reports;

b) lacking certain information in the source data, such as the dates and locations for examinations;

c) missing entire MRI reports and/or containing reports that were completely redacted for unknown reasons;

d) containing unsigned medical reports;

e) containing reports that were dated for before diagnostic tests; and

f) having inconsistent patient data (such as dates of birth) from record to record.

86. The result of these findings was a conclusion by GeoSera that the findings were highly suspicious and indicated fraudulent activity. The MRI reports were not obtained through the use of GCPs, thus rendering the data acquired from the MRI reports questionable in terms of use in the NM101 study. GeoSera further recommended additional investigations to determine what the root cause of the missing data or inability to validate the data in the patient files to confirm whether patients were even eligible for final analysis in the NM101 study.

87. As a result of the audit, GeoSera concluded that the clinical research organization should have halted the study at the site yet did not do so despite over twelve multi-day monitoring visits. GeoSera further noted that the site was able to update patient files with notes that did not contain information required to validate underlying sources of data, the result of which prevented site staff from being able to properly evaluate the patient eligibility for the study.

**False and Misleading Statements**

***December 7, 2022 Form 8-K***

88. On December 7, 2022, the Company filed a current report on Form 8-K with the SEC (the "12/22 8-K"). The 12/22 8-K was signed by Defendant Do and attached an investor presentation and a letter to the Company's shareholders. The letter to shareholders stated the following, in relevant part:

> We also recently announced that ***BioVie's Phase 3 trial in AD has fully enrolled the targeted 316 patients*** and that the company is opting to increase study size to 400 due to our fast enrollment pace. The trial protocol specified enrolling at least 316 patients. The protocol also pre-specified the potential for a review when roughly 50% of the 316 enrolled patients have completed the study to determine if increasing enrollment of up to 400 patients might be desirable for the purpose of enhancing the probability of achieving statistical significance. The pace of enrollment increased dramatically in recent months, creating a situation where the Company finished enrolling all 316 patients before 50% of enrolled patients had completed the study. ***Thus, we decided that forgoing the interim analysis and continuing enrollment up to 400 patients is the best course for obtaining the strongest possible data set***. We believe all 400 patients can be enrolled in the coming months and anticipate topline results will be available before the end of 3Q2023. By taking this step we believe we have enhanced our probability for success, and thus our ability to bring this hoped for innovation to the Alzheimer's patient community.

89. The statements emphasized above were materially false and/or misleading because the NM101 clinical trial had not been "fully enrolled" pursuant to its protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study.

Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

90. Moreover, the Company further misled investors by representing that it was "forgoing" the DSMB review and continuing to enroll additional patients as a way to "obtain[] the strongest possible data set." In truth, the Company's then-current "data set" contained fraudulent data, as well as data from patients who were ineligible to participate in the study. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's study protocol. Thus, the statements above were materially false and misleading because they misrepresented the reasons that the Company needed and/or wanted additional data and failed to disclose the truth about BioVie's then-existing data set.

91. The investor presentation also included similar statements, including the following slide which reiterated the NM101 enrollment information:

[This space intentionally left blank]




92. The statements in the slide above were materially false and misleading when they represented that the NM101 study had enrolled "more than 316" patients properly and in accordance with the trial's protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***February 10, 2023 Form 10-Q***

93. On February 10, 2023, BioVie filed its quarterly report on Form 10-Q with the SEC for the second quarter ("2Q23") of the 2023 Fiscal Year (the "2Q23 10-Q"), which was signed by Defendant Do on behalf of the Company. With respect to the NM101 study's enrollment and targets for completion, the 2Q23 10-Q stated the following, in relevant part:

> In neurodegenerative disease, the Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single-regulated kinase ("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved, represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate Alzheimer's disease (NCT04669028). ***The Company is targeting primary completion of this study in the third quarter of calendar year 2023***.
>
> . . .
>
> The increase in research and development expenses of $1.3 million was primarily due to the Neuroscience NE3107 studies, which were significantly more active during the three months ended December 31, 2022 compared to the three months ended December 31, 2021. The Parkinson's Phase 2 study initiated in January 2022, became fully enrolled with the top-line data read reported in December 2022 and ***the Alzheimer Phase 3 study is approaching full enrollment***. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $100,000 of the net increase in research and development expenses for three months ended December 31, 2022.

94. The statements emphasized above were materially false and misleading when they represented that the NM101 study was "approaching full enrollment" in accordance with the trial's protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment

in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

95. In addition, the statements discussing the target "completion" of the NM101 study were also false and misleading because they concealed the inevitable delay that would result from the fact that the NM101 study had the aforementioned data integrity issues and patient fraud. They also created the false impression that the NM101 study was proceeding in accordance with its protocol. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's protocol.

96. With respect to risks arising from the protocol and compliance violations in the NM101 study, the 2Q23 10-Q stated the following, in relevant part:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, regulatory, and scientific standards and regulations, and our reliance on third parties does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices ("cGCPs"), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. ***If we or any of these third parties fail to comply with applicable cGCPs or fail to enroll a sufficient number of patients***, we may be required to conduct additional clinical trials to support our marketing applications, which would delay the regulatory approval

> process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.
>
> Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of our clinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be challenging, potentially leading to mistakes as well as difficulties in coordinating activities.
>
> Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, ***if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements***, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.
>
> If any of our relationships with trial sites, or any CRO that we may use in the future, terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

97. The statements emphasized above were materially false and misleading because the Company painted these risks regarding the clinical data and enrollment as purely hypothetical when, in reality, BioVie was already failing to comply with applicable cGCPs and failing to enroll a sufficient number of eligible patients into the NM101 trial.

***March 2, 2023 Press Release***

98. On March 2, 2023, the Company published a press release titled "BioVie Announces Completion of Patient Enrollment in Phase 3 Trial Assessing NE3107 in Alzheimer's Disease." The press release stated the following, in relevant part:

> CARSON CITY, Nev., March 02, 2023 (GLOBE NEWSWIRE) -- BioVie Inc. (NASDAQ: BIVI) ("BioVie" or the "Company"), a clinical-stage company developing innovative drug therapies for the treatment of neurological and neurodegenerative disorders and advanced liver disease, today announced that its NM101 trial evaluating NE3107 in the treatment of patients with Alzheimer's Disease, has ***achieved its revised enrollment target of 400 patients***. The Company anticipates announcing top line results from the study in October 2023.
>
> The NM101 trial is a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC).
>
> The NM101 trial protocol originally specified enrolling at least 316 patients equally randomized to treatment and placebo arms. The protocol also pre-specified the potential for a review by the data safety monitoring board (DSMB), in a manner that is blinded to the Company, when roughly 50% of the 316 enrolled patients have completed the study to determine if increasing enrollment of up to 400 patients might be desirable for the purpose of enhancing the probability of achieving statistical significance. ***Due to an accelerating pace of enrollment as the trial progressed, the Company enrolled 316 patients before 50% of enrolled patients had completed the study. Consequently, the Company decided to proceed to 400 patients without the pre-specified interim analysis***.
>
> "***We look forward to having topline data from this trial in October***," said Cuong Do, BioVie's President and CEO. "We are optimistic that this trial will provide similar data to what was seen in the Phase 2 exploratory study, which showed that patients treated with NE3107 experienced enhanced cognition as measured by multiple assessment tools, including a 2.1 points improvement on the modified ADAS-Cog12 scale."

99. The statements emphasized above were materially false and misleading when they represented that the NM101 trial had "achieved its revised enrollment target of 400 patients" and that the Company had "enrolled 316 patients before 50% of enrolled patients had completed the study." Notably, the Company had enrolled a material number of patients, as many as 80%, who

should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

100. In addition, the above statements regarding the October date for "topline data" were also false and misleading because they concealed the inevitable delay that would result from the fact that the NM101 study had the aforementioned data integrity issues and patient fraud. They also created the false impression that the NM101 study was proceeding in accordance with its protocol. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's protocol.

***March 23, 2023 Form 8-K***

101. On March 23, 2023, the Company filed a current report on Form 8-K with the SEC (the "3/23 8-K"). The 3/23 8-K attached and investor presentation, which provided, *inter alia*, the following information with respect to the enrollment status and progress of the NM101 trial in terms of its target completion date:




102. The statements in the slide above were materially false and misleading when they represented that the NM101 study was "fully enrolled" pursuant to its protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

103. In addition, the above statements regarding the October date for "topline data" were also false and misleading because they concealed the inevitable delay that would result from the fact that the NM101 study had the aforementioned data integrity issues and patient fraud. They also

created the false impression that the NM101 study was proceeding in accordance with its protocol. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's protocol.

104. The 3/23 8-K's attached investor presentation also provided detailed information on NM101's data without disclosing the critical problems associated with it, including the fact that it included fraudulent patient data. Indeed, the investor presentation represented the following, in relevant part:




105. The statements in the slide above were materially false and misleading when they represented that "baseline data" showed "evidence of metabolic inflammation" in certain subjects. These statements concealed the aforementioned data integrity issues and patient fraud, which both had a substantial negative impact on the strength of the data the Company possessed. They also created the false impression that the NM101 study was proceeding in accordance with its protocol. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's protocol.

***May 12, 2023 Form 10-Q***

106. On May 12, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2023 (the "3Q23 10-Q"), which was signed by Defendant Do on behalf of the Company. With respect to the NM101 study's enrollment and targets for completion, the 1Q23 10-Q stated the following, in relevant part:

> The Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single-regulated kinase("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate AD (NCT04669028). ***The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023***.
>
> . . .
>
> The increase in research and development expenses of approximately $6.7 million was primarily due to the Neuroscience NE3107 studies, which were significantly more active during the three months ended March 31, 2023, compared to the three months ended March 31, 2022. The Parkinson's Phase 2 study initiated in January 2022 reported top results and ***the Alzheimer Phase 3 study reached full enrollment***. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $124,000 of the net increase in research and development expenses for three months ended March 31, 2023.

107. The statements emphasized above were materially false and misleading when they represented that the NM101 study had "reached full enrollment" pursuant to its protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients

in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***July 18, 2023 Shareholder Letter***

108. On July 18, 2023, the Company published a letter to its shareholders. The letter was written by Defendant Do and stated the following, in relevant part:

> Dear Shareholders,
>
> The company has made tremendous progress since I last wrote you in December, and ***the totality of the data we have shared lead me to be increasingly excited and optimistic about what we hope to see when our Phase 3 trial for NE3107 in Alzheimer's Disease (AD) reads out later this year***. I have prepared this letter to shareholders to provide an update that synthesizes all the information that we have released and presented at recent medical conferences.
>
> . . .
>
> Our NM101 trial has been ***fully enrolled*** since February 2023 and is nearing its completion by the end of September. Topline data readout is expected in the October-November timeframe.
>
> ***As we approach data readout, I am increasingly optimistic about what we hope to see based on the totality of the data that we have disclosed***. The data described above is suggestive that NE3107 may have an active epigenetic effect associated with improvements in inflammation, insulin signaling, and other critical biological processes in a manner that is significantly correlated to improvements in cognition, AD biomarkers, and imaging endpoints. This small exploratory trial involving just 23 patients provided statistically significant data on so many measures and correlations. Assuming that epigenic changes seen in the Phase 2 trial is coming from NE3107 activity and not some placebo or random effect, one would expect the 200 patients treated with NE3107 in the NM101 trial should have dramatically different results from the 200 patients in the placebo arm on these same measures.
>
> Additionally, the data we recently presented at the 83rd Scientific Sessions of the American Diabetes Association that took place June 23-26 give[s] further support for what we can expect. This poster presentation did not provide any results or readouts. Instead, ***it provided the first data on the 400 patients in the NM101 trial as they started the trial (i.e., at baseline)***, including:

> - The large majority of patients had elevated inflammatory markers and were overweight. Large portions have some degree of metabolic dysregulation, including hypertension (61%), impaired glucose metabolism (52%), insulin resistance (47%), hypertriglyceridemia (40%) and hypercholesterolemia (30%).
>
> - Patients who are amyloid beta positive (Aβ+) had comparable CDR-SB scores at baseline as those who are Aβ negative (Aβ-). This supports our thesis all along that Aβ cannot be the only factor driving AD or cognitive decline.
>
> - Aβ+ patients had worse ADAS-Cog12 and MMSE scores (indicating lower cognitive functioning) than the Aβ- patients, while the Aβ- patients had significantly higher inflammation, insulin resistance, IFG, and hypertension, compared to their Aβ+ counterparts. We interpret this data to mean that metabolic factors are critical drivers of cognitive decline for everyone, and that the presence of Aβ is a contributory – but not a causal – factor for the cognitive decline.
>
> Patients treated with NE3107 in prior trials have seen improvements in inflammation, glucose metabolism, insulin resistance, hypercholesterolemia, hypertriglyceridemia, etc. We believe the fact that patients started the trial with elevated levels of these factors provides additional cautious optimism for the NM101 trial as NE3107 has demonstrated a potential impact on these areas in previous studies.

109. The statements emphasized above were materially false and misleading because they failed to disclose the data integrity issues associated with the NM101 trial. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***August 16, 2023 Form 10-K***

110. On August 16, 2023, the Company filed its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Do, Lang, Sherman, Berman, Gorlin, Hariri, and Rogich and contained SOX certifications signed by Defendant Do attesting to its accuracy. With respect to the NM101 study's enrollment and targets for completion, the 2023 10-K stated the following, in relevant part:

> In neurodegenerative disease, the Company's drug candidate NE3107 inhibits inflammatory activation of extracellular single-regulated kinase ("ERK") and Nuclear factor kappa-light-chain-enhancer of activated B cells ("NFkB") (e.g., tumor necrosis factor ("TNF") signaling) that leads to neuroinflammation and insulin resistance, but not their homeostatic functions (e.g., insulin signaling and neuron growth and survival). Both inflammation and insulin resistance are drivers of Alzheimer's disease ("AD") and Parkinson's disease ("PD").
>
> The Company is conducting a potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel-group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). ***The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023***.
>
> . . .
>
> The Company is conducting a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in patients who have mild to moderate AD (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC). ***The program is fully enrolled and is targeting primary completion in the fourth quarter of the calendar 2023 year***.

111. The statements emphasized above were materially false and misleading when they represented that the NM101 study was "fully enrolled" pursuant to its protocol. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data

failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's enrollment status were materially false and misleading and/or lacked a reasonable basis at all relevant times.

112. In addition, the statements discussing the target "completion" of the NM101 study were also false and misleading because they concealed the inevitable delay that would result from the fact that the NM101 study had the aforementioned data integrity issues and patient fraud. They also created the false impression that the NM101 study was proceeding in accordance with its protocol. Due to the foregoing, BioVie needed additional data in order to maintain the "power" of the study pursuant to NM101's protocol.

113. The 2023 10-K also represented the following, in relevant part, with respect to the Company's compliance with regulations pertaining to clinical trials:

> In the United States, the FDA regulates drugs under the Federal Food, Drug and Cosmetic Act, or FDCA, and implements regulations. Drugs are also subject to other federal, state and local statutes and regulations. Biologics are subject to regulation by the FDA under the FDCA, the Public Health Service Act, or the PHSA, and related regulations, and other federal, state and local statutes and regulations. Biological products include, among other things, viruses, therapeutic serums, vaccines and most protein products. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. ***Failure to comply with the applicable United States requirements at any time during the product development process, approval process or after approval, may subject an applicant to administrative or judicial sanctions***. FDA sanctions could include refusal to approve pending applications, withdrawal of an approval, a clinical hold, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement or civil or criminal penalties. Any agency or judicial enforcement action could have a material adverse effect on us.
>
> The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following: . . . ***Performance of adequate and well-controlled human clinical trials according to the FDA's current good***

> ***clinical practices, or GCPs, to establish the safety and efficacy of the proposed drug or biologic for its intended use*** . . . .
>
> Clinical trials involve the administration of the drug or biological candidate to healthy volunteers or patients having the disease being studied under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. ***Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety***. Each protocol must be submitted to the FDA as part of the IND. ***Clinical trials must be conducted in accordance with the FDA's good clinical practices requirements***. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the informed consent form that must be provided to each clinical trial subject or his or her legal representative and must monitor the clinical trial until it is completed.

114. The statements emphasized above were materially false and misleading because they falsely represented to investors that the NM101 study met the requirements being discussed when in truth, it did not. Indeed, at the time Defendants made these rosy representations, BioVie had already received confirmed reports from at least two independent third-party auditors that the NM101 study data included fraudulent patient date which suggested that the study had enrolled patients that it should not have. Due to the foregoing, the Company was subjected to the precise FDA sanctions that the Company warned about. However, the Company concealed these existing risks from investors, creating the false impression that the NM101 study was being conducted in compliance with applicable regulations.

115. With respect to any risks associated with the protocol and compliance violations in the NM101 study, the 2023 10-K stated the following, in relevant part:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal,

regulatory, and scientific standards and regulations, and our reliance on third parties does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices ("cGCPs"), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. ***If we or any of these third parties fail to comply with applicable cGCPs or fail to enroll a sufficient number of patients***, we may be required to conduct additional clinical trials to support our marketing applications, which would delay the regulatory approval process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.

Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of ourclinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be challenging, potentially leading to mistakes as well as difficulties in coordinating activities.

Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, ***if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements***, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.

If any of our relationships with trial sites, or any CRO that we may use in the future, terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and

> protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

116. The statements emphasized above were materially false and misleading because the Company painted these risks regarding the clinical data and enrollment as purely hypothetical when, in reality, BioVie was already failing to comply with applicable cGCPs and failing to enroll a sufficient number of eligible patients into the NM101 trial.

117. The 2023 10-K also represented the following with respect to clinical trials:

> The process of obtaining FDA approval is costly and time consuming. Current FDA requirements for a new human drug or biological product to be marketed in the United States include, among other things: (a) the successful conclusion of pre-clinical laboratory and animal tests, if appropriate, to gain preliminary information on the product's safety; (b) filing with the FDA of an IND application to conduct human clinical trials for drugs or biologics; (c) the successful completion of adequate and well-controlled human clinical investigations to establish the safety and efficacy of the product for its recommended use; and (d) filing by a company and acceptance and approval by the FDA of a NDA for a drug product or a BLA for a biological product to allow commercial distribution of the drug or biologic. A delay in one or more of the procedural steps outlined above could be harmful to us in terms of getting our product candidates through clinical testing and to market, which could have a materially adverse effect on our business.
>
> . . .
>
> Even if we are successful in developing BIV201 and NE3107, our product candidates, we have limited experience in conducting or supervising clinical trials that must be performed to obtain data to submit in concert with applications for approval by the FDA. The regulatory process to obtain approval for drugs for commercial sale involves numerous steps. Drugs are subjected to clinical trials that allow development of case studies to examine safety, efficacy, and other issues to ensure that sale of drugs meets the requirements set forth by various governmental agencies, including the FDA. In the event that our protocols do not meet standards set forth by the FDA, ***or that our data is not sufficient to allow such trials to validate our drugs in the face of such examination***, we might not be able to meet the requirements that allow our drugs to be approved for sale which could have a materially adverse effect on our business.

118. The statements emphasized above were materially false and misleading because the Company painted these risks regarding the clinical data and enrollment as purely hypothetical when, in reality, BioVie was already failing to comply with applicable cGCPs and failing to enroll a sufficient number of eligible patients into the NM101 trial.

***September 8, 2023 Form 8-K***

119. On September 8, 2023, the Company filed a current report on Form 8-K with the SEC, which also attached an investor presentation. With respect to the enrollment status and progress of the NM101 trial in terms of its target completion date, the investor presentation represented the following:




120. The statements in the slide above were materially false and misleading because they failed to disclose the data integrity and patient fraud issues as discussed herein. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient

data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made above regarding NM101's "read out" of data were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***October 25, 2023 Press Release***

121. On October 25, 2023, the Company published a press release disclosing the data presented from the NM101 Phase 3 clinical trial. The press release stated the following, in relevant part:

> Carson City NV, October 25, – BioVie Inc., (NASDAQ: BIVI) ("BioVie" or the "Company") a clinical-stage company developing innovative drug therapies for the treatment of advanced liver disease and neurological and neurodegenerative disorders, announced that blinded data on cognitive, biomarker and imaging findings from the recently completed Phase 3 clinical trial (NCT04669028) of NE3107 in the treatment of mild to moderate Alzheimer's Disease (AD) were presented today as an oral presentation at the 16th Clinical Trials on Alzheimer's Disease (CTAD) in Boston, MA.
>
> The presentation, Clinical Outcomes from a Phase 3, Randomized, Placebo-Controlled Trial of NE3107 in Subjects with Mild to Moderate Probable Alzheimer's Disease, detailed a cross sectional analysis of blinded data from BioVie's Phase 3 study and discussed participants whose data were available for analysis as of October 18, 2023 (n=322). These preliminary analyses will be updated once the complete and final dataset becomes available and when the study database is locked, unblinded and analyzed in full.
>
> ***The blinded data presented suggest that NE3107 is a biologically active compound exerting potential effects as observed by biomarker, imaging, cognitive and functional assessments. Population changes from baseline were observed, with some patients demonstrating an improvement after 30 weeks of treatment with the double blinded oral study drug (NE3107 or matched placebo) as compared to baseline, while many were also observed to have worsened, which is consistent with the natural progression of the disease (Figure 1)***.
>
> . . .
>
> "***The blinded data presented at CTAD show encouraging changes from baseline that would not typically be seen without a treatment effect, which provides us with confidence that NE3107 may show a clear benefit over placebo when the data from this trial is unblinded in the coming weeks***," commented Joseph Palumbo, BioVie's Chief Medical Officer. "We believe NE3107 has the potential become to effective multi-mechanistic treatment for Alzheimer's that is safe and can be orally administered."

> The last patient came in for the last treatment visit in late September 2023, and ***the Company is currently resolving outstanding database queries*** and preparing for database freeze and data unblinding. The Company expects to announce unblinded, topline data from this trial in the November/December timeframe.

122. The statements emphasized above were materially false and misleading because they failed to disclose the data integrity and patient fraud issues as discussed herein. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients.

***November 1, 2023 Conference Call***

123. On November 1, 2023, the Company held a conference call with analysts to discuss the Phase 3 trial. Defendants Do and Palumbo hosted the call, and during his opening remarks, Defendant Do stated the following, in relevant part:

> ***So we presented the data that we had as of October 18 from roughly 322 subjects, whose data were verified or in the process of being verified and cleaned as of this date***.
>
> . . .
>
> ***And in looking at the totality of the data, we conclude that any NE3107 appears to be biologically active and that it appears to be having an impact on the cognitive biomarkers and end-to-end points that we've looked at in the trial***.
>
> . . .
>
> And as we look at this pattern, we see great -- we have some optimism that there is an effect, a drug effect going on. We need to make that comment because if there were not a drug effect, you would expect all the subjects to be clumped together.

> And that would be roughly around the no-change line or it's somewhat worsening, somewhat getting better if there's a learning or a placebo effect.
>
> But the fact that we see a pattern of maybe people getting better and many people getting worse, which suggests to us that there is something going on beyond just a group, the drug that not working. You would not see a lot of people getting a lot better if there is not something going on here, right? And the magnitude of the clinical getting better from this blinded data is a little too large from what you would expect from just a placebo effect.

124. In addition, Defendant Palumbo stated the following, in relevant part, with respect to the trial:

> ***So [the results tell] us that we've captured the right individuals for this study***. It shows that in the course of only six months, who started out as negative shift, towards positive, it gives us a good look at the sensitivity of this study. And that -- and remember, half of these folks are on drug and half are on placebo.
>
> So for me, this is a signal I was looking for in the midst of COVID, in the midst of everything else. Did we capture the right patients and would they progress as expected, right? And you wouldn't necessarily see this in a study that was only looking at positive patients at baseline. Now the data and positivity is great, of course, that we have people who shift towards this negative status, and that is absolutely exciting.
>
> ***Also, this validation study is long enough, at least to me, in looking at the shift from negative to positive in a six-month basis of the study***. And so I'm actually very happy with that. And that was all I really wanted to say, Cuong.

125. Later, during the Q&A portion of the call, Defendant Do stated:

> So with that, I know that we have over time here, let me close the call by saying that ***we are cautiously optimistic when looking at the totality of the data***, right? And I do not believe you can look at any one particular measure to say things are working or not working, ***you have to look at the totality of the data***.
>
> ***And the totality of the data here would suggest that NE3107 appears to have an underlying biological effect and that biological effect appears to be having an impact on the cognitive, functional, biomarker and imaging endpoints that we are looking at in this trial***.
>
> So we are cautiously optimistic that when we unblind the data after Thanksgiving or early December, that this could potentially lead to a significant improvement, a significant new tool for the community to treat Alzheimer's disease when it's fully registered.

126. The statements emphasized above were materially false and misleading because they failed to disclose the data integrity and patient fraud issues as discussed herein. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients.

**<u>The Truth Emerges</u>**

127. The truth began to emerge during after market hours on November 8, 2023 when the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2023 (the "1Q24 10-Q"), which was signed by Defendant Do on the Company's behalf. The 1Q24 10-Q revealed the following, in relevant part:

> [D]uring routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites. We have alerted the FDA's Office of Scientific Integrity ("OSI") about these issues and believe OSI will perform a thorough, competent, objective and fair research of any potential scientific misconduct and non-compliance of GCPs and regulation. Sensitivity analysis excluding data from these six problematic sites has been performed and accounted for in the statistical analysis plan for the study (NCT04669028). Nonetheless, these findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study (NCT04669028) and may require additional clinical studies to confirm the final results of the study.

128. On this news, the price per share of the Company's common stock fell to a low of $2.31 per share on November 9, 2023, from a closing price of $4.26 on November 8, 2023.

129. The truth fully emerged on November 29, 2023 when the Company filed a current report on Form 8-K with the SEC which represented that BioVie "issued a press release and posted on its website at https://BioViepharma.com/ an investor presentation disclosing top line data from its clinical trial of NE3107 in the treatment of mild to moderate Alzheimer's Disease." The Form 8-K attached a copy of the press release, which stated the following, in relevant part:

> The trial started during the COVID-19 pandemic when access to clinical sites was limited and enrolled a total of 439 patients through 39 sites. Upon trial completion, the Company found significant deviation from protocol and Good Clinical Practice (GCP) violations at 15 sites (virtually all of which were from one geographic area). This highly unusual level of suspected improprieties led the Company to exclude all patients from these sites and to refer them to the U.S. Food and Drug Administration (FDA) Office of Scientific Investigations (OSI) for further action. After these exclusions, 81 patients remained in our Modified Intent to Treat (MITT) population, 57 of whom were in the Per-Protocol population which included those who completed the trial and were verified to take study drug from pharmacokinetic (PK) data.

130. The Form 8-K also attached a copy of the investor presentation, which gave more detail on the "significant deviation from protocol" noted in the press release. In relevant part, the investor presentation stated:

> • The Company monitors blinded data to track safety and ensure timely data entry into the EDC
>
> • The company started noticing unusual data patterns when enough patients completed the trial. Pentara (a leading AD biostatistics firm) reviewed the blinded data and found:
>
> > o Several sites had anomalous data (e.g. inconsistent patterns compared to historical data, large proportions of patients improving compared to baseline, unusual variability patterns)
> >
> > o All patients in a particular demographic group enrolled in this trial showed a data pattern not explainable based on disease progression and which substantially deviated from historical data far this demographic in other AD trials
> >
> > o Without unblinding and PK data, there was no way to identify the cause. Clear subgroup analyses identified: anomalous sites vs. other sites; identified demographic group vs. all others
>
> • In parallel, BioVie had the first opportunity to start the data review process as sites started to finish patient-facing activities in early summer 2023

o Noticed deviations from expectations (e.g. data patterns, missing data, copied/pasted MRI results, etc.)

. . .

• CROs identified six sites with numerous and significant procedural deviations, which led us to:

o Updated SAP to 1) exclude all patients from affected sites; and 2) pre-specify a series of subgroup analyses

o Amended our protocol: 1) Finalize CDR-SB and ADAS-Cog12 as primary endpoints based on prior FDA communications; 2) Created "adaptive trial" design

o Reported the 6 sites to the FDA's Office of Scientific Investigations

• As data was unblinded, anomalous data from the identified demographic group was confirmed to be scientifically improbable. Furthermore, all patients in this demographic were associated with the previously identified anomalous sites, and virtually all of which were concentrated in a single geographic area. Accordingly, these sites were also excluded per our SAP and additionally referred to the FDA.

131. The investor presentation also disclosed that "[u]nanticipated exclusion of sites due to deviations led to study being underpowered. Adaptive feature of trial allows the Company to continue enrolling patients to reach statistical significance."

132. Also on November 29, 2023, the Company held a conference call with analysts and investors which was presented by Defendants Do and Palumbo and the CEO of Pentara Corporation. During the call, Defendant Do revealed that the NM101 trial "did not achieve statistical significance because we had to exclude so many patients from the trials that we believe engaged in improper practices." He also revealed that the Company had to exclude 358 patients, which accounted for "over 80% of our enrolled populations due to suspected improper conduct at 15 clinical sites," and that "all of these clinical sites had been referred to the FDA."

133. In addition, Defendant Do admitted that what the Company had found at the impacted clinical sites was "so unusual." Moreover, in attempting to provide more information on why the Company thought it needed to exclude the 256 patients, Defendant Do represented that each side was tasked

with uploading data to an electronic database for its patients called the "EDC," that the EDC is maintained by the CRO, and that, with respect to the blinded data, the Company only had read access.

134. Defendant Do also stated the following, in relevant part, regarding six of the clinical sites excluded:

> In parallel, patient facing activities started to wrap up at some of the sites in July of 2023, which provided us the first opportunity to conduct a detailed data review and validation….that is when we started to notice higher than expected levels of deviations….that is when we made the decision to undertake a multi-step review process that involved hiring a supplemental CRO to conduct quality control visits to all sites and then to conduct source data verification or SDV on 100 percent of the materials touched in the clinical sites. Subsequently, a third CRO was hired to audit sites as well. We took this level of proactive actions and diligence that goes way above what is typically done by pharma companies because we understood the importance of this data. We finally received the final QC reports from the supplemental CRO on November 6th, which revealed that six sites that enrolled 128 patients had what appeared to be numerous and significant GCP violations and deviations from our protocol. The deviations were to such an extent that we had to act.
>
> . . .
>
> [W]hen we saw this problem we acted rapidly and vigorously, rather than ignore it because we could not condone the practices we uncovered, such as when multiple patients came in for an MRI scan on the same day they ended up having the same result posted with their records…as a result we did the following: first we updated our statistical analysis plan or SAP to exclude all data from these six deviating sites because the patients and their data were totally suspect. Second, we amended our protocol with the FDA to do two things – first is that we finalize the primary endpoints to be CDR-SB and ADAS-Cog. This was a planned activity as a result of our interaction with the FDA over months…the second thing is that we revised the clinical trial design itself to be an adaptive design so that we may work with the FDA to potentially continue enrolling additional patients if we see an efficacy signal but miss on stats due to the excluded sites. And the third thing we did was referred all six sites to the FDA's Office of Scientific Investigations three days after receiving the CRO's report….on November the 9th.

135. With respect to the other nine sites excluded, Defendant Do stated the following:

> When we started unblinding the data, we focused first on the sub-group analyses that Pantera recommended, right, and we found that the anomalous data from the patients from the identified demographic groups could not be explained scientifically. The placebo patients are not expected to significantly and dramatically improve as we saw in the data from this demographic group. The same thing was found regarding the anomalous sites. And, in fact, the problem identified with the demographic group and the anomalous sites turned out to be one and of the same in that virtually all patients from the demographic group were associated with the anomalous sites, which were all located in one geographic area. Thus, we had to exclude these nine sites that enrolled

a total of 230 patients as well per our pre-specified SAP. Since virtually all of the now 15 sites suspected of improprieties were in a single geographic area, we suspect that there may be more going on; thus, we referred all 15 sites to the FDA. And since we have a deep respect for the FDA and their investigative processes we are not identifying the geographic area and sites and we have not notified any of the sites as to their status… by excluding 358 patients or over 80% of our enrollment we were left with 81 patients in our modified intent to treat population. This also meant that we only had 57 in the per protocol populations, which are patients who have completed the trial, patients who we can verify have taken the study drug through PK, and so forth.

136. In attempting to explain how this issue occurred, Defendant Do stated:

So the natural question is how could this have happened? That is a great question and I wish I had a simple, great answer for you. But, I believe there are a few confounding factors that got us here. First, we started enrolling the trial at the height of the COVID-19 pandemic, where there was limited access to the sites. In fact, the limited access remained the case for most of the duration of the trial. We rely on third-parties to execute and monitor the trials so one could say the on the ground oversight of the sights [sic] was not what it needed to be. Second, we assumed good intent. There are nearly 500,000 clinical sites registered in clinicaltrials.gov, all of whom are licensed. They have to adhere to GCP, and they are periodically audited by the FDA and other agencies. We presumed that our clinical sites would act responsibly, but we found ourselves victim of suspected coordinated improprieties at a level that none of us have seen in our careers. It's just so unusual. There's just no other way of describing it.

137. Later, during the Q&A segment of the call, Defendant Do admitted the following, in relevant part:

What's very very clear to us here is that monitoring, on-site monitoring of what was going on was not where it needed to be, right, and so frankly one of the things we will do is what I have done for my other clinical trials in Asia for example, is we are going to take a belt-and-suspenders approach, right? In those trials I always have my own CRAs alongside the CRO's monitors out at the sites, right, and we are essentially going to go with more established sites that have conducted more of these Alzheimer trials, and frankly we have changed our CRO. And so those are some of the things that we will be doing immediately and we will be working…to identify the other safeguards that we need to put in place – along with the FDA – I think the FDA will have a point of view kind of given the bit of a scandal that we have here with these sites.

138. An analyst then asked Defendant Do about the "big picture," stating:

What gives you confidence, excluding these patients, that the data holds, and what would motivate a region, not just one clinical trial site to actually, you know, not run the trial the way it is designed? Like what really happened?

139. In response, Defendant Do stated the following, in relevant part:

> I don't want to start any conspiracy theories or anything else like that. And it's actually the vast majority or virtually all of 15 sites are in the same geographic area, right, and that is the reason why we have referred this thing on to the FDA to investigate because we would be just speculating, right? We do know in certain other disease that there is phenomena [of] professional patients that may be part of what is going on here but I am not going to speculate anything else.

140. On this news, the price per share of the Company's stock fell $3.03, from a closing price of $4.99 per share on November 28, 2023 to close at $1.96 per share on November 29, 2023.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

### *Despite Knowing the Results of the Audits, the Company Tried to Conceal and Ignore the Results*

141. The Company hired GeoSera in or around July 2023 with the hope that GeoSera would sign off on the data in the NM101 study. The owner of GeoSera, John Carlos Diaz ("Diaz"), at all relevant times held close personal relationships with senior level employees of BioVie, including Defendant Palumbo and the Company's Chief Regulatory Officer and Senior Vice President David Morse.

142. In order to properly conduct its review, GeoSera hired six independent contractors for the project. On August 6, 2023, a medical monitor for BioVie (Dr. Nily Osman) reported on potentially fraudulent data regarding MRI reports within patient files in the NM101 study at Site No. 145, located in Cutler Bay, Florida.

143. As a result, GeoSera sent two members of its project team to Site No. 145 to investigate the potentially fraudulent patient files. These auditors confirmed the issues identified by Dr. Osman during the August 2023 audit. While the audit was being conducted, one of the site owners mentioned to one of the auditors that this was not this site's first audit (referencing the December 2022 audit). The auditor also learned that the site had a received a "follow-up" letter from the Company, the site responded to this letter, however the site never received a "close-out" letter from the Company. A "close-out" letter is a written confirmation from an auditor and/or sponsor staff that any and all

violations that had been identified during an audit were properly corrected and no longer impede the study.

144. Prior to this interaction, the GeoSera auditors were unaware of the prior audit, atypical as industry standard normally requires site staff and/or study sponsors to provide all prior audit materials. The auditors requested Diaz to obtain the prior audit materials. Diaz did not request a copy of the materials. Instead, the auditors were reliant on Annettee Ferrell, one of Diaz's employees, to obtain the materials from the Company. Upon receiving the request for the December 2022 audit, Flynn Edred ("Eldred"), the Company's Vice President, Head of Quality, attempted to not provide report before reluctantly turning it over. At this point, the GeoSera auditors discovered that the issues that were identified in the December 2022 audit were unresolved and able to continue throughout the NM101 study.

145. The Company attempted to edit the audit reports from GeoSera's audit. For example, when the report was submitted to Edred and Dr. Morse, Edlred told the auditors to remove the Company as the party responsible for follow-up, a request that is heavily against industry practices. Additionally, the Company sent high-level medical monitors and additional research associates to independent audits that were conducted by third parties. This occurred at a different audit at a different site, again going against industry standards.

146. Shortly after the GeoSera audit in August 2023, Defendant Do informed Dr. Osman to disregard the findings of the audit and proceed with the data as it was. Defendant Do and Defendant Palumbo, as well as the Company's CFO Wendy Kim and Chief Regulatory Officer Morse, prevented Dr. Osman from continuing her review. The Company instead used a different third-party auditor who was willing to overlook data validity issues and approve the study data.

***Standards and Regulations Made it Impossible for the Individual Defendants to Be Unaware of the Red Flags***

147. Per industry standards, customary practices, and trial protocol, the Company was required to conduct the NM101 study in accordance with the trial protocol, GCPs, FDA regulatory requirements, and the ethical principles of the Declaration of Helsinki.

148. Per federal regulations, "[s]ponsors are responsible for selecting qualified investigators, providing them with the information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug." 21 C.F.R. § 312.50.

149. Similarly, GCPs state that it is sponsors who are responsible for implementing and maintaining quality assurance and quality control systems with written operating procedures. This is despite a sponsor's ability to transfer trial-related duties to a third-party clinical research organization. As was stated in Guidance for Industry, E6 Good Clinical Practice: Consolidated Guidance 24 (1996) Section 5.2.1, "A sponsor may transfer any or all of the sponsor's trial-related duties and functions to a CRO, but the ultimate responsibility for the quality and integrity of the trial data always resides with the sponsor."

150. The Company itself admitted as much, as in its quarterly filings with the SEC, BioVie stated: "***we are responsible*** for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, regulatory, and scientific standards and regulations, and ***our reliance on third parties does not relieve us of our regulatory responsibilities***. We and these third parties are required to comply with current good clinical practices ('cGCPs'), which are regulations and guidelines

enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development."

***Defendant Do Falsely Certified Quarterly Reports Under SOX***

151. As the Company's CEO, Defendant Do signed each of the Company's quarterly and annual reports, including those identified above as containing false and misleading statements. Further, Defendant Do signed SOX certifications as required by Congress and the SEC ""to facilitate full disclosure and ensure the accuracy of financial reports by requiring corporate executives' personal stamp of approval." 149 Cong. Rec. S5325, S5329 (daily ed. Apr. 11, 2003).

152. Despite this, all of Defendant Do's certifications were knowingly false. There were at least two instances (the Audits) in which members of the Company's executive leadership received reports from independent auditors detailing evidence of fraudulent data within the NM101 study. Defendant Do received these reports through the internal disclosure controls he certified. As such, Defendant Do knew or deliberately disregarded the falsity of his statements in the Company's filings, yet certified their accuracy anyway.

## DAMAGES TO BIOVIE

153. As a direct and proximate result of the Individual Defendants' conduct, BioVie has lost and expended, and will continue to lose and expend, many millions of dollars.

154. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

155. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

157. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

158. As a direct and proximate result of the Individual Defendants' conduct, BioVie has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control.

## DERIVATIVE ALLEGATIONS

159. Plaintiff brings this action derivatively and for the benefit of BioVie to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of BioVie, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control.

160. BioVie is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

161. Plaintiff is, and has been at all relevant times, a shareholder of BioVie. Plaintiff will adequately and fairly represent the interests of BioVie in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

162. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

163. A pre-suit demand on the Board of BioVie is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Do, Lang, Sherman, Berman, Hariri, and Rogich (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants who are on the Board at the time this action is commenced.

164. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

165. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted BioVie to issue materially false and misleading statements. Specifically, the Director-Defendants caused BioVie to issue false and misleading statements which were intended to make BioVie appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166. Additional reasons that demand on Defendant Do is futile follow. Defendant Do has served as the Company's CEO and President since April 27, 2021 and as a Company director since 2016. As such, the Company provides Defendant Do with his principal occupation for which he receives

lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Do was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period. In addition, as the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed and made SOX certifications for the false and misleading 2023 10-K. Moreover, Defendant Do is named as a defendant in the Securities Class Action. For these reasons, Defendant Do breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Berman is futile follow. Defendant Berman has served as a Company director since June 2019. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2023 10-K. Moreover, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Berman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Hariri is futile follow. Defendant Hariri has served as a Company director since June 2020. He also serves as a member of the Governance

Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2023 10-K. For these reasons, Defendant Hariri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Lang is futile follow. Defendant Lang has served as Chairman of the Board since March 2023 and as a Company director since 2016. He also serves as Chair of the Governance Committee and as a member of the Audit Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2023 10-K. For these reasons, Defendant Lang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Rogich is futile follow. Defendant Rogich has served as a Company director since June 2020. He also serves as a member of the Audit Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2023 10-K. For these reasons, Defendant

Rogich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171. Additional reasons that demand on Defendant Sherman is futile follow. Defendant Sherman has served as a Company director since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Governance Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2023 10-K. For these reasons, Defendant Sherman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on the Board is futile follow.

173. Defendants Berman, Sherman, Lang, and Rogich (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law and breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants

breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

174. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

175. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176. The acts complained of herein constitute violations of fiduciary duties owed by BioVie's officers and directors, and these acts are incapable of ratification.

177. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of BioVie. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of BioVie, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

178. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause BioVie to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

180. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BioVie's business and affairs.

182. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BioVie.

184. In breach of their fiduciary duties owed to BioVie, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, the data integrity issues associated with the NM101 trial. Notably, the Company had enrolled a material number of patients, as many as 80%, who should not have been enrolled; this, in turn, contradicted Defendants' public statements with respect to the number of enrolled patients and/or the status of patient enrollment in the NM101 study. Moreover, the Audits provided additional confirmation that the Company had enrolled patients in the trial that did not meet the eligibility criteria under the study protocol and/or whose data failed to confirm that they were eligible for the study. Additionally, despite the fact that the findings from the Audits were contained to only one site, the Company later scrapped patient data from up to 15 different sites, which left the NM101 study with data from only about 80 patients. As a result of the foregoing, the statements made were materially false and misleading and/or lacked a reasonable basis at all relevant times.

185. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

186. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

187. Moreover, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual

Defendants' false and misleading statements, reaping combined total proceeds of approximately $224,805.

188. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioVie's securities.

189. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioVie's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

190. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BioVie has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Unjust Enrichment**

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BioVie.

195. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from BioVie that was tied to the performance or artificially inflated valuation of BioVie, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

196. Plaintiff, as a shareholder and a representative of BioVie, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

197. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

## THIRD CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

198. Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

199. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

200. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused BioVie to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

201. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

202. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

**<u>FOURTH CLAIM</u>**
**Against the Individual Defendants for Gross Mismanagement**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BioVie in a manner consistent with the operations of a publicly held corporation.

205. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, BioVie has sustained and will continue to sustain significant damages.

206. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

207. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

208. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BioVie, for which they are legally responsible.

210. As a direct and proximate result of the Individual Defendants' abuse of control, BioVie has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of BioVie, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached aided and abetted the breach of their fiduciary duties to BioVie;

(c) Determining and awarding to BioVie the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing BioVie and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BioVie and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the

following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of BioVie to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding BioVie restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 30, 2024

**THE BROWN LAW FIRM, P.C.**

Of Counsel:
Timothy Brown
767 Third Ave, Suite 2501
New York, NY 10017
tbrown@thebrownlawfirm.net
Ph.: (516)922-5427

Dated: December 30, 2024

**LEVERTY & ASSOCIATES LAW CHTD.**

/s/ *William R. Ginn* .
Patrick R. Leverty, NV Bar No. 8840
William R. Ginn, NV Bar No. 6989
832 Willow Street
Reno, NV 89502
pat@levertylaw.com
bill@levertylaw.com
Ph. (775)322-6636

*Attorneys for Plaintiff*

# VERIFICATION

I, Andrew Hulm, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24__ day of December, 2024.

Signed by:

C6D24458980F41C...

Andrew Hulm